UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Jeremias Mejia

     v.

US Immigration and Customs
Enforcement and Removal Operations,
Field Office Director, et al.

Civil No. 26-cv-205-LM-AJ
Opinion No. 2026 DNH 037 P

**O R D E R**

Jeremias Mejia petitions for a writ of habeas corpus under 28 U.S.C. § 2241, alleging that his civil immigration detention is unlawful. Mejia was taken into custody by Immigrations and Customs Enforcement ("ICE") in March 2026 after living in the community on an order of supervision for over twenty years. He contends that respondents failed to provide him with adequate notice of the grounds for revocation of his supervised release or a meaningful opportunity to contest those grounds. Respondents object. Doc. no. 8. For the following reasons, the petition (doc. no. 1) is granted.

**STANDARD OF REVIEW**

This court may grant a writ of habeas corpus to a person held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The petitioner has the burden of proving that his confinement is unlawful. Espinoza v. Sabol, 558 F.3d 83, 89 (1st Cir. 2009).

## BACKGROUND[1]

Mejia is a Honduran citizen. Prior to his March 2026 incarceration, he resided in Massachusetts, where he has significant community and family ties. Mejia entered the United States over thirty years ago in December of 1994.[2]

In October of 1999, the United States Citizenship and Immigration Services ("USCIS") granted Mejia's application for Temporary Protected Status ("TPS"). "[T]he TPS program . . . provides humanitarian relief to foreign nationals in the United States who come from specified countries." Sanchez v. Mayorkas, 593 U.S. 409, 412 (2021). "The government may designate a country for the program when it is beset by especially bad or dangerous conditions, such as arise from natural disasters or armed conflicts."[3] Id. "The country's citizens, if already present in the United States, may then obtain TPS." Id. "That status protects them from removal and authorizes them to work here for as long as the TPS designation lasts." Id. In addition, once a noncitizen is granted TPS, they must periodically re-register for TPS benefits. 8 C.F.R. § 244.17. Failure to do so may result in termination of the noncitizen's benefits. Id.

---

[1] The following information is drawn from the petition (doc. no. 1) and the exhibits attached to the government's objection (doc. no. 8).

[2] The circumstances of Mejia's entry are not clear from the parties' submissions.

[3] The government designated Honduras for the TPS program in 1999 as a result of widespread damage caused by Hurricane Mitch. Nat'l TPS All. v. Noem, --- F. Supp. 3d ----, ----, 2025 WL 4058572, at *3 (N.D. Cal. 2025), stayed, No. 26-199 (9th Cir. Feb. 9, 2026).

2

In July 2004, Mejia pleaded guilty to sexual abuse in the second degree in violation of New York Penal Law § 130.60. Judgment on that guilty plea entered in September 2004. Mejia re-applied for TPS benefits in January 2005.

On March 2, 2005, ICE detained Mejia and initiated removal proceedings under 8 U.S.C. § 1229a. The Notice to Appear alleged that Mejia was removable pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) on the ground that Mejia was a noncitizen "present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General." Doc. no. 8-9 at 1; see 8 U.S.C. § 1182(a)(6)(A)(i). On March 8, 2005, an Immigration Judge ordered Mejia removed from the United States. ICE released Mejia from custody on an order of supervision on March 11, 2005, in light of Mejia's pending TPS re-application.

USCIS granted Mejia's January 2005 TPS re-application in March 2006. Mejia thereafter continued to periodically re-register for TPS benefits. Most recently, in September 2024, USCIS approved Mejia's TPS reapplication, extending his TPS benefits from January 6, 2024 to July 5, 2025.

On July 8, 2025, the Secretary of the Department of Homeland Security ("DHS") announced that Honduras would be removed from the TPS program effective September 8, 2025, and that all TPS-related benefits to Honduran citizens

would terminate on that date.[4] On or about September 25, 2025, USCIS terminated Mejia's TPS benefits.

On March 13, 2026, ICE detained Mejia when he appeared for a routine check-in and revoked his order of supervision. That date, ICE issued a Notice of Revocation of Release which stated that Mejia's "release has been revoked pursuant to 8 C.F.R. § 241.4(*l*)" because "[t]he purposes of release have been served."  Doc. no. 8-4 at 1. The Notice did not provide any other information regarding the basis of or reason for Mejia's detention. ICE did not serve the Notice on Mejia on the date of his arrest. Instead, ICE served him the Notice on March 14 after he was already incarcerated at the Strafford County Department of Corrections ("SCDOC") in New Hampshire. The Notice is signed by an Acting Field Office Director with ICE.

---

[4] The Secretary's removal of Honduras from the TPS program is the subject of ongoing litigation in the Ninth Circuit. See Nat'l TPS All., --- F. Supp. 3d at ----, 2025 WL 4058572, at *1. The Northern District of California entered a partial final judgment on December 31, 2025, vacating the Secretary's removal of Honduras from the program under the Administrative Procedure Act. Id. at *29. The Ninth Circuit has stayed the district court's vacatur. Nat'l TPS All., No. 26-199 (9th Cir. Feb. 9, 2026). Neither party has briefed the effect of this litigation on the instant case. And, while Mejia's petition seeks temporary injunctive relief barring his removal "while the Court reviews this petition," doc. no. 1 at 18, he does not seek a writ of habeas corpus enjoining his removal as a remedy for success on his claims. This court would probably lack authority to assess the propriety of Mejia's removal in any event. 8 U.S.C. § 1252(g); see, e.g., M.S.L. v. Bostock, Civ. No. 6:25-cv-01204-AA, 2025 WL 2430267, at *7 (D. Or. Aug. 21, 2025) (explaining that courts have construed § 1252(g) as barring review of ICE's ability to remove a particular noncitizen but not review of the legality of the manner in which ICE executes a removal order).

The Notice stated that Mejia "will be afforded an informal interview" at which he would have "an opportunity to respond to the reasons for this revocation [and] submit any evidence or information" he wished to be reviewed in support of release. Id. at 2. That interview took place on March 14 at SCDOC. Based on the materials provided by the parties, it is unclear what was communicated to Mejia by the officer conducting the interview regarding the reasons for the revocation of his release. However, Mejia told the officer both orally and in writing that he believed his TPS status was still in effect in light of pending litigation in the Ninth Circuit, and that, even if his TPS was terminated, he would like the opportunity to apply for asylum.

Mejia filed the instant § 2241 petition on March 19, 2026.[5] He seeks a writ of habeas corpus ordering his immediate release on the ground that, inter alia, ICE failed to comply with its own regulations and his due process rights in revoking his release.

---

[5] Magistrate Judge Johnstone issued a service order the next day. Among other things, the service order directed respondents to provide the court with at least 72 hours' notice in advance of any transfer of Mejia to another facility. On the same date the service order issued, respondents transferred Mejia to a facility in Louisiana. Respondents acknowledge that they received notice of the service order approximately one hour before the plane to Louisiana departed. Respondents identify no reason they could not have delayed Mejia's transfer in order to comply with the service order's requirements.

On April 3, 2026, respondents filed a notice that they are in the process of returning Mejia to New Hampshire due to "operational needs." Doc. no. 9 at 1. It is unclear at the time of this order's issuance whether Mejia has been returned to New Hampshire. Regardless, his temporary transfer out-of-state did not deprive this court of jurisdiction. See Williams v. Warden, FCI Berlin, 786 F. Supp. 3d 436, 450 (D.N.H. 2025).

**DISCUSSION**

As noted, Mejia is subject to a final order of removal. The statutory authority to detain individuals subject to a final order of removal generally stems from 8 U.S.C. § 1231(a). Section 1231(a) provides that, when a noncitizen "is ordered removed, the Attorney General shall remove the [noncitizen] from the United States within a period of 90 days" after one of three triggering events. 8 U.S.C. § 1231(a)(1). This 90-day period is known as the "removal period." 8 U.S.C. § 1231(a)(1)(A). Detention is mandatory during the removal period. Id. § 1231(a)(2)(A).

Generally, if the noncitizen "is not removed within the removal period," the Attorney General "shall" release the noncitizen "subject to supervision." Id. § 1231(a)(3). An exception applies for noncitizens, like Mejia, who are ordered removed on the ground that they are inadmissible under 8 U.S.C. § 1182. Id. § 1231(a)(6). Such noncitizens "may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in" § 1231(a)(3). Id.

Two regulations govern the exercise of governmental discretion to detain or release noncitizens who are not removed during the removal period. See 8 C.F.R. §§ 241.4, .13.[6] "The first, 8 C.F.R. § 241.4, requires that ICE conduct an initial

---

[6] Section 241.13 was promulgated, and § 241.4 was amended, "shortly after [Zadvydas v. Davis, 533 U.S. 678 (2001)], aligning INS's policies with the decision's limitations on noncitizen detentions." Nguyen v. Lyons, C.A. No. 25-cv-631-MSM-PAS, 2026 WL 125093, at *2 (D.R.I. Jan. 16, 2026) (citing Continued Detention of Aliens Subject to Final Orders of Removal, 66 Fed. Reg. 56967, 56967-70 (Interim Rule Nov. 14, 2001)).

'custody review' for a noncitizen that it seeks to detain beyond the removal period, at the conclusion of which ICE may 'release [the noncitizen] under an order of supervision . . . if it determines that the [noncitizen] would not pose a danger to the public or a risk of flight, without regard to the likelihood of the [noncitizen's] removal in the reasonably foreseeable future.'" Vo v. Lyons, Civ. No. 25-cv-533-JL-TSM, 2026 WL 323133, at *3 (D.N.H. Jan. 27, 2026) (Laplante, J.) (alterations in original) (quoting 8 C.F.R. § 241.13(b)(1) (describing the applicability of § 241.4)). "Alternatively, an order of release under section 241.13 may be based on a determination that there is 'no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future.'" Phommachak v. Wesling, --- F. Supp. 3d ----, ----, 2026 WL 157491, at *4 (D. Mass. 2026) (quoting 8 C.F.R. § 241.13(a)).

Both regulations allow for the revocation of release previously granted thereunder. Release previously granted under § 241.4 may be revoked by the "Executive Associate Commissioner" or the "district director . . . when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner." 8 C.F.R. § 241.4(*l*)(2). In addition, release may be revoked by any person whom the Executive Associate Commissioner has "designated in writing . . . [may] exercise powers under this section" to revoke release. Id. § 241.4(c)(4). To revoke release, the proper official must find that: (i) "[t]he purposes of release have been served"; (ii) the noncitizen has violated a condition of release; (iii) "[i]t is

appropriate to enforce a removal order or to commence removal proceedings against" the noncitizen; or (iv) the noncitizen's conduct, "or any other circumstance, indicates that release would no longer be appropriate." Id. § 241.4(*l*)(2).

"Upon revocation," the noncitizen must be "notified of the reasons for revocation of his or her release." Id. § 241.4(*l*)(1). After being returned to custody, the noncitizen must "promptly" be provided with "an initial informal interview . . . to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification." Id. § 241.4(*l*)(1). If the noncitizen is not released from custody after this informal interview, he is entitled to the review process set forth in other subsections of the regulation for noncitizens who are not released after expiration of the removal period.[7] Id. § 241.4(*l*)(3); see also id. §§ 241.4(h), (i), (k). However, if the noncitizen's "prompt removal is practicable and proper," the "district director . . . may, in his or her discretion, suspend or postpone the custody review process." Id. § 241.4(k)(3).

---

[7] "The normal review process will commence with notification to the [noncitizen] of a records review and scheduling of an interview, which will ordinarily be expected to occur within approximately three months after release is revoked." Id. § 241.4(*l*)(3); see also id. §§ 241.4(h)(1)-(2) (establishing records review process); id. § 241.4(i)(3) ("[I]f the [noncitizen] is not recommended for release [following the records review], a Review Panel shall personally interview the detainee."). This normal review process "will include a final evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." Id. § 241.4(*l*)(3). "Thereafter, custody reviews will be conducted annually under the provisions of paragraphs (i), (j), and (k) of this section." Id.

To revoke an order of supervision previously issued under 8 C.F.R. § 241.13, ICE must make an individualized determination "based on changed circumstances [that] removal has become significantly likely in the reasonably foreseeable future." Kong v. United States, 62 F.4th 608, 619-20 (1st Cir. 2023) (citing 8 C.F.R. § 241.13(i)(2)). Unlike § 241.4, the authority to revoke a noncitizen's release under § 241.13 is not limited to specified officials. See 8 C.F.R. § 241.13(i)(2) (providing that "[t]he Service" may revoke release). But, like § 241.4, § 241.13 requires the noncitizen to be notified of the reasons for revocation "[u]pon revocation." Id. § 241.13(i)(3). Section 241.13 also requires ICE to "conduct an initial informal interview promptly after" the noncitizen is detained to afford him or her "an opportunity to respond to the reasons for revocation stated in the notification." Id.

"The First Circuit Court of Appeals has made clear that once ICE releases a noncitizen under § 1231 and its implementing regulations, it may not simply re-detain that person at will. Rather, re-detention must comply with the regulatory framework that implements Zadvydas and § 1231." Vo, 2026 WL 323133, at *4 (citing Kong, 62 F.4th at 619-20). While "not every procedural misstep raises a constitutional issue . . . , where an immigration 'regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute,' like the opportunity to be heard, 'and ICE fails to adhere to it, the challenged [ICE] action is invalid.'" Rombot v. Souza, 296 F. Supp. 3d 383, 388 (D. Mass. 2017) (brackets omitted) (quoting Waldron v. I.N.S., 17 F.3d 511, 518 (2d Cir. 1993)); see also United States v. Caceres, 440 U.S. 741, 751 n.14 (1979) ("Where the rights of

9

individuals are affected, it is incumbent upon agencies to follow their own procedures." (quoting Morton v. Ruiz, 415 U.S. 199, 235 (1974))).

Turning to the facts of this case, as an initial matter, it is difficult to determine the regulation under which Mejia was released in March 2005. The release order does not identify the authority under which Mejia was released, but rather simply notes that Mejia was "TPS eligible" and therefore instructed he be "release[d] under an order of supervision." Doc. no. 8-6 at 1. Nor does the order of supervision specify the authority under which he was released, instead only stating that he was being released "[b]ecause the Service has not effected your deportation or removal during the period prescribed by law." Doc. no. 8-3 at 1. And, while the Notice of Revocation states that Mejia's release was being revoked under § 241.4, see doc. no. 8-4 at 1, ICE's attempt to revoke release pursuant to a particular regulatory scheme does not itself show that Mejia was originally released under that scheme.

However, the court need not resolve which regulation applies because the procedures used to revoke Mejia's release were inadequate under either regulation. Both regulations require ICE to "articulate a meaningful, individualized basis for revocation sufficient to give the noncitizen notice of the grounds for re-detention and an opportunity to respond." Vo, 2026 WL 323133, at *4; see also Noem v. Abrego Garcia, 145 S. Ct. 1017, 1019 (2025) (Sotomayor J., statement respecting the Court's disposition of the application) (explaining that, to revoke release under § 241.4, the government "must provide adequate notice" of the grounds for

10

revocation in order to permit the noncitizen a meaningful "opportunity to respond" (quoting 8 C.F.R. § 241.4)); accord Sarail A. v. Bondi, 803 F. Supp. 3d 775, 787 (D. Minn. 2025) (noting the same requirement under § 241.13). "[G]eneric and conclusory statements" offered in a Notice of Revocation "are insufficient bases for revoking . . . supervised release" under either regulation, as "dozens of federal courts across the country" have concluded. Hall v. Nessinger, C.A. No. 25-cv-667-JJM-PAS, 2026 WL 18583, at *7 (D.R.I. Jan. 2, 2026) (collecting cases); see also Vo, 2026 WL 323133, at *5 ("Courts in this circuit have repeatedly rejected attempts to justify immigration detention or re-detention based on conclusory or post hoc rationales rather than contemporaneous, individualized findings.").

Mejia's Notice of Revocation failed to provide him with adequate notice. It states only that his release has been revoked because "[t]he purposes of release have been served." Doc. no. 8-4 at 1. But "[t]he notice does not identify any specific changed circumstances to support" this assertion. Perez-Escobar v. Moniz, 792 F. Supp. 3d 224, 226 (D. Mass. 2025). A conclusory assertion that the purposes of a noncitizen's release have been served fails to apprise the noncitizen of the factual basis upon which his release is being revoked, and thereby fails to afford him a meaningful opportunity to be heard in response. See Sarail A., 803 F. Supp. 3d at 787 ("Simply to say that circumstances had changed or there was a significant likelihood of removal in the foreseeable future is not enough. Petitioner must be told what circumstances had changed or why there was now a significant likelihood of

11

removal in order to meaningfully respond to the reasons and submit evidence in opposition, as allowed under § 241.13(i)(3).").

The requirement of meaningful notice in advance of an opportunity to be heard "is no mere technicality, but rather a core component of the regulatory scheme that implements the constitutional limits courts have recognized in Zadvydas and protects against arbitrary re-detention." Vo, 2026 WL 323133, at *4; accord, e.g., Hall, 2026 WL 18583, at *4 ("The procedures set forth in both 8 C.F.R. § 241.4 and 8 C.F.R. § 241.13 are intended to provide noncitizens with fundamental due process protections that courts have found to be constitutionally required."). While a Notice of Revocation need not "include any particular magic words," it must "provide real, specific, concrete information that a noncitizen could actually respond to." Hashemi v. Noem, 809 F. Supp. 3d 1027, 1035 (C.D. Cal. 2025).

Although respondents now assert that Mejia's release was revoked because USCIS terminated his TPS benefits, there is no indication that this was communicated to Mejia in a manner that permitted him to meaningfully respond to the basis for his detention at the informal interview on March 14. Indeed, although the Notice of Revocation is dated March 13, it was not served on him until March 14. See doc. no. 8-4 at 2. And the ICE officer who conducted Mejia's interview at SCDOC is the same officer who served the Notice upon him at the same correctional facility. See id.; doc. no. 8-5 at 1. From the evidence available to the court, it appears that the Notice of Revocation was served upon Mejia at or near the time of the interview and only after he had been detained for approximately twenty-four

hours. Thus, even if the Notice of Revocation had advised Mejia of the factual basis for his re-detention, respondents failed to serve him with that Notice "[u]pon revocation" of his release as both regulations require, which materially limited the extent to which he could contest his detention at the required informal interview. 8 C.F.R. § 241.4(*l*)(1); accord id. § 241.13(i)(3). "The opportunity to contest detention through an informal interview is not some ticky-tacky procedural requirement; it strikes at the heart of what due process demands." Grigorian v. Bondi, --- F. Supp. 3d ----, ----, 2025 WL 2604573, at *9 (S.D. Fla. 2025).

The basis for revoking a noncitizen's release must be communicated to the noncitizen at a time and in a manner that permits him to marshal evidence demonstrating that his liberty ought not be restrained. See Aponte-Rosario v. Acevedo-Vilá, 617 F.3d 1, 9 (1st Cir. 2010) ("[I]t is well-settled that the essential requirements of procedural due process include adequate notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990))). In this case, that did not occur. Especially where the termination of Honduras from the TPS program is the subject of ongoing litigation in the Ninth Circuit, see n.4, supra, meaningful notice of the asserted grounds for termination of Mejia's release could have permitted him to gather evidence and arguments to contest the revocation of his supervision.

What is more, to the extent that § 241.4 provides the grounds for the revocation of Mejia's release (as is now claimed by the government, see doc. no. 8 at 1, and as was claimed in the Notice of Revocation itself, see doc. no. 8-4 at 1), there

is no evidence that an official with authority to revoke Mejia's release under § 241.4 did so. As noted, the persons empowered to revoke release under § 241.4 include (1) the "Executive Associate Commissioner," (2) the "district director" if the district director concludes that "revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner," and (3) any person to whom the Executive Associate Commissioner has delegated in writing the authority to revoke a noncitizen's release under § 241.4. 8 C.F.R. § 241.4(*l*)(2); see id. § 241.4(c)(4).[8] Section 241.4 "refers to previous Immigration and Naturalization Service [('INS')] position titles," not ICE position titles. Rombot, 296 F. Supp. 3d at 387. "[I]n 2002, Congress passed the Homeland Security Act, 'transferr[ing] authority to commence removal proceedings from [INS] to . . . DHS,' which, of course, now includes ICE." Ceesay v. Kurzdorfer, 781 F. Supp. 3d 137, 160 (W.D.N.Y. 2025) (alterations in original) (quoting Ali v. Mukasey, 524 F.3d 145, 150 (2d Cir. 2008)). "The Homeland Security Act also contains a provision stating that, where functions have been transferred by the Act to DHS, statutory references to the authority that was formerly responsible for those functions will be deemed to refer to DHS." Ali, 524 F.3d at 150 (citing 8 U.S.C. § 557 ("With respect

---

[8] Unlike § 241.4(*l*)(2), § 241.13(i)(2) "does not limit the authority to revoke release to certain designated officials." Pogosyan v. Bondi, No. 5:25-cv-03121-SRM-AS, 2026 WL 544717, at *3 (C.D. Cal. Feb. 23, 2026). Section 241.13 states that "[t]he Service may revoke" a noncitizen's release. 8 C.F.R. § 241.13(i)(2). As explained below, this is a reference to the former Immigration and Naturalization Service, which is now deemed by statute to include ICE. See Ali v. Mukasey, 524 F.3d 145, 150 & n.5 (2d Cir. 2008).

to any function transferred by or under this chapter . . . , reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.")).

Under DHS's regulations, the term "Commissioner," after March 1, 2003, "mean[s] the Director of U.S. Citizenship and Immigration Services, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears." 8 C.F.R. § 1.2. Thus, as used in § 241.4, the term "Executive Associate Commissioner" refers to the "Executive Associate Director" of ICE. Ceesay, 781 F. Supp. 3d at 160.

DHS's regulations also set forth that, where regulations provide that the "district director" has certain authority, that title is deemed to include, inter alia, an ICE "field office director," but only "to the extent that authority has been delegated to such official . . . for a  particular geographic district, region, or area." 8 C.F.R. § 1.2. Thus, while § 241.4 provides that the "district director" may also revoke a noncitizen's release if doing so is in the public interest and the circumstances do not reasonably permit referral to the Executive Associate Commissioner, an ICE "field office director" may exercise that authority only if he or she has been expressly delegated it. Ceesay, 781 F. Supp. 3d at 161.

"[S]everal federal courts . . . have held that a failure to adhere to the requirement that an Executive Associate Director or a Field Office Director make

the determination to revoke release in compliance with 8 C.F.R. § 241.4 violates due process and thus mandates release." Santamaria Orellana v. Baker, Civ. No. 25-1788-TDC, 2025 WL 2841886, at *4 (D. Md. Oct. 7, 2025). The information available to this court does not permit the conclusion that an official with the authority to revoke Mejia's release under § 241.4 did so. As highlighted above, the Notice of Revocation is signed by an Acting Field Office Director of ICE. Per DHS's own regulations, a power previously possessed by an INS Executive Associate Commissioner is not transferred by virtue of 8 U.S.C. § 557 to an ICE Acting Field Office Director. See 8 C.F.R. § 1.2. Nor is there evidence that the Acting Field Office Director who signed Mejia's Notice of Revocation has been delegated the authority of an ICE Executive Associate Director or an INS district director to revoke a noncitizen's release after finding that revocation is in the public interest and that there is insufficient time to refer the matter to the Executive Associate Director. And even if such evidence was in the record, there is no indication that the Acting Field Office Director who signed Mejia's Notice of Revocation concluded that revocation of Mejia's release was in the public interest and that it was not reasonably practical to obtain the Executive Associate Director's approval. See Zhang v. Genalo, --- F. Supp. 3d ----, ----, 2025 WL 3733542, at *9 (E.D.N.Y. 2025) ("[E]ven if the term 'district director' might include Robinson's current role as an 'assistant field office director,' which is far from clear, the government has not alleged that Robinson made the requisite findings—explicitly or otherwise—before

16

revoking Zhang's release." (brackets omitted) (quoting Ceesay, 781 F. Supp. 3d at 162)).

"[T]he absence of proof that the officer was properly designated and that necessary findings were made raises a serious question as to the lawfulness of the revocation." Morales Sanchez v. Bondi, 811 F. Supp. 3d 1166, 1174 (C.D. Cal. 2025). Because Mejia's release was revoked by an official who lacked authority to do so, "he is entitled to release on that basis alone." Ceesay, 781 F. Supp. 3d at 162; accord, e.g., M.S.L. v. Bostock, Civ. No. 6:25-cv-01204-AA, 2025 WL 2430267, at *10 (D. Or. Aug. 21, 2025).

When the revocation of a noncitizen's supervised release fails to adhere to regulatory procedures that safeguard noncitizens' due process rights, courts have found the appropriate remedy to be release subject to the conditions of the noncitizen's previous order of supervision. M.S.L., 2025 WL 2430267, at *11; see, e.g., Rombot, 296 F. Supp. 3d at 389; see also Funes v. Francis, 810 F. Supp. 3d 472, 502 (S.D.N.Y. 2025) (identifying "numerous cases releasing habeas petitioners held in custody following procedural due process violations" and rejecting the argument "that the remedy in habeas for a procedural due process violation resulting in a loss of liberty is an order mandating corrective 'process'"). The court finds that such relief is warranted here.

## CONCLUSION

For the foregoing reasons, Mejia's petition (doc. no. 1) is granted. To the extent they have not already done so, respondents are ordered to return Mejia to

the Strafford County Department of Corrections within twenty-four hours, where he will immediately be processed for release and released under the conditions of his previous order of supervision. If Mejia has already been returned to New Hampshire, he shall be released within twenty-four hours. Within twenty-four hours of Mejia's release from custody, respondents shall file a status report confirming their compliance with the foregoing requirements.

SO ORDERD.

_____
Landya McCafferty
United States District Judge

April 7, 2026
cc:    Counsel of Record